UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DIANA ISAYEVA, | No.  2:13-cv-02015-KJM-KJN |
| Plaintiff, | |
| v. | ORDER |
| COUNTY OF SACRAMENTO, and SEAN BARRY, | |
| Defendants. | |

        This action arises out of the fatal police shooting of Paul Tereschenko (the decedent) by Sacramento County Sheriff's Deputy Sean Barry.  Plaintiff Diana Isayeva is the decedent's surviving spouse and his alleged survivor-in-interest.  Plaintiff brings this action under 42 U.S.C. § 1983 and California state laws against Deputy Barry and the County of Sacramento.  Defendants now move for summary adjudication on plaintiff's § 1983 claims and state law survival claims.  ECF No. 50.  The court held a hearing on the matter on July 10, 2015, at which Dale Galipo appeared telephonically for plaintiff and Robert Chalfant appeared for defendants.  As explained below, the court GRANTS the motion in part and DENIES the motion in part.

I.     BACKGROUND

     A.     Procedural Background

Plaintiff commenced this action in this court on September 27, 2013. (ECF No. 1.) The operative third amended complaint alleges the following claims: (1) a survival and wrongful death claim for excessive force under § 1983 against Barry; (2) a substantive due process claim, alleging loss of familial relationship against Barry; (3) survival and wrongful death claims for battery under state law against Barry and vicariously against the County; and (4) a wrongful death claim for negligence against Barry and vicariously against the County. (ECF No. 48.) Plaintiff is seeking compensatory damages, including survival and wrongful death damages, and punitive damages against defendant Barry. (*Id.*) After motion practice, defendants answered on June 11, 2015. (ECF No. 49.)

On June 12, 2015, defendants filed the pending motion for summary adjudication. (Defs.' Mot., ECF No. 50.) Plaintiff opposed (ECF No. 56) and defendants replied (ECF No. 57). On July 10, 2015, after hearing and without leave of court, plaintiff filed a supplemental brief regarding compliance with the Tort Claims Act and the applicable standard for evaluating the reasonableness of the Taser's use in this case. (ECF No. 61.) On July 13, 2015, defendants moved to strike plaintiff's supplemental brief. (ECF No. 62.) The court did not authorize or request supplemental briefing on any issue after the matter was submitted. The court GRANTS defendants' motion to strike.

     B.     Undisputed Facts

The decedent was married to plaintiff and had lived with her for approximately one month when the events at issue occurred. (Plaintiff's Resp. Stmt. Undisp. Mat. Facts (UMF2) No. 39, ECF No. 56-1.) On February 18, 2013, plaintiff's brother called 911 and reported the decedent was acting strangely and plaintiff's family wanted him removed from the home. (UMF2 Nos. 40–41.) The decedent also called 911 about the family trying to evict him. (UMF2 No. 43.) The 911 calls gave no indication anyone had committed a crime or was armed. (UMF2 No. 44.)

2

When Deputies Barry and Gray arrived at the home, they spoke with plaintiff's brother for about ten minutes. (UMF2 No. 45.) The deputies also learned the decedent allegedly told his brother-in-law earlier that day that he was hearing voices in his head that plaintiff's brother should kill her. (Barry Int. 8:247–49, 10:322–326, Ex. C, ECF No. 56-4; Barry Depo. 125:5–9; Gray Depo. 47:1–10.) Defendants argue these statements establish he was homicidal. (Mot. at 11.)

The deputies found the decedent standing in his bedroom with plaintiff sitting near him in a chair. (UMF2 No. 50.) The deputies spoke with him for approximately seven to ten minutes. (UMF No. 5.) The decedent was over six feet tall and weighed over 250 pounds. (UMF No. 13.) He was unarmed and no weapons were visible. (UMF2 No. 51.) Barry asked the decedent for identification and he complied. (UMF2 No. 52.) The decedent told the deputies he had schizophrenia. (UMF2 No. 53.) Both deputies also suspected he might be under the influence of methamphetamine because of his rapid speech, behavior, and physiological symptoms. (UMF No. 6.) Barry believed the decedent could pose a danger to others and should be detained under California Welfare and Institutions Code section 5150.[1] (UMF No. 9.) Barry planned to place him in handcuffs and escort him to Barry's patrol vehicle. Barry did not recall telling the decedent to put his hands behind his back or that he was going to handcuff him. (Barry Depo. 81:22–82:2.)

After Barry told the decedent to sit on his bed a couple of times, the decedent complied and spoke calmly with the deputies. (Barry Int. 338–341.) Barry told plaintiff to leave the bedroom. (UMF2 No. 56.) She maintained a partial view of the room from outside. (UMF No. 37.) After plaintiff exited the room, the decedent got down on his knees and began rambling, saying "you are gonna have to shoot or kill me." (Barry Int. 371–378.) The deputies informed

---

[1] California Welfare and Institutions Code section 5150 provides, in pertinent part, "When a person, as a result of a mental health disorder, is a danger to others, or to himself or herself, or gravely disabled, a peace officer . . . may, upon probable cause, take, or cause to be taken, the person in to custody for a period of up to 72 hours for assessment, evaluation, and crisis intervention, or placement for evaluation and treatment in a facility designated by the county for evaluation and treatment and approved by the State Department of Health Care Services."

the decedent they were not arresting him, but rather taking him to a facility to get him help. (UMF No. 14.)

The deputies asked the decedent to turn around and stand against the wall. (UMF No. 15.) The decedent initially complied by stepping towards the wall, but plaintiff testified he kept turning around. (Isayeva Depo. 75:9–21, Ex. H, ECF No. 50-6.) Barry feared the decedent was reaching for something with his left hand. (Barry Int. 12:391–92; Gray Depo. 59:10–20.) Barry grabbed the decedent's left arm and Gray grabbed his right arm. (UMF No. 19.) The decedent stiffened his arms, preventing Gray from placing him in a control hold. (UMF No. 20.) Deputy Gray and plaintiff both testify to hearing Barry warn the decedent he was going to tase him, but Barry testified he gave no such warning. (Gray Depo. 73:9–16; Isayeva Depo. 77:7–10; *but see* Barry Depo. 82:6–8.) After struggling for a few seconds to control the decedent's arms, Barry tased him in his back between his shoulder blades in drive-stun mode for one five second cycle.[2] (Barry Depo. 79:16–17.)

After he was tased, the decedent attacked the deputies. The parties dispute whether Barry was thrown into a wall or the decedent inadvertently "bucked" him towards the wall in reaction to the Taser. (Barry Depo. 84:7–12; *but see* Gray Int. 442–445.) Gray was either punched, pushed, or thrown backwards. (Gray Depo. 71:13–15, 72:6–12; *but see* Barry Depo. 97:11–13.) Barry testified the decedent hit him several times in the head, face, ear, neck and back. (Barry Depo. 90:10–13.) Gray then jumped on the decedent's back and attempted to place him in a carotid hold,[3] but was pushed off. (UMF Nos. 27–28.)

Next, Barry testified the decedent knocked him backwards, his vision became hazy, and he felt he was about to pass out. (Barry Depo. 93:3–17.) On the other hand, plaintiff

---

[2] As explained in a Ninth Circuit case, drive-stun mode involves touching the Taser directly to the body to deliver a painful electric shock without overriding the victim's central nervous system. *See Mattos v. Agarano*, 661 F.3d 433, 443 (9th Cir. 2011).

[3] According to one district court case, when using a carotid hold, an officer places his arm around the victim's neck to constrict blood flow through the carotid artery, which supplies oxygenated blood to the brain. *See Knapps v. City of Oakland*, 647 F. Supp. 2d 1129, 1143 (N.D. Cal. 2009). The victim loses consciousness, but breathing continues uninterrupted. *Id.*

1   counters Barry's medical records show he suffered only minor and superficial injuries.  (Barry
2   Med. Records, Ex. E, ECF No. 56-5.)  While Barry's medical records indicate he did have a head
3   injury, they note it "did not appear serious."  *Id.*  Further, Gray testified he never saw the
4   decedent's punches land (Gray Depo. 83:21–22; 85:17–23) and never saw Barry losing
5   consciousness.  (Gray Depo. 92:7–8).

6   Barry jumped backwards toward the bed.  (UMF No. 31.)  He yelled for Gray to
7   shoot the decedent, but Gray did not draw his gun.  (UMF2 No. 73.)  Gray and plaintiff give
8   conflicting testimony on whether Barry also said, "I'm going to shoot."  (*See* Gray Depo. 100:7–
9   9; Isayeva Depo. 79:13–22.)  Barry testified the decedent advanced on him with raised fists.
10  (Barry Depo. 95:16–24.)  Barry then shot the decedent three times.  (UMF2 No. 75.)  Plaintiff
11  counters that Barry's initial interview only indicated the decedent was standing and facing him
12  (Barry Int. 419–426) and Gray did not recall if the decedent raised his fists (Gray Depo. 82:15–
13  17).  These minor variations do not create an issue of material fact.  Plaintiff does not produce
14  evidence that the decedent was standing still when he was shot.  Plaintiff estimates the physical
15  altercation lasted about two minutes.  (UMF No. 36.)

16  Barry was woozy for about ten to fifteen seconds after firing the shots.  (Barry Int.
17  426–440.)  After the paramedics checked Barry, he went to the station to give his statement.
18  (Barry Int. 454-461; UMF2 No. 83.)  He later felt nauseated and went to the emergency room.
19  (Barry Depo. 112:5–14.)  At the hearing on the instant motion, the parties confirmed that Barry
20  went to the emergency room late that night, after he began feeling nauseated toward the end of
21  giving his statement.  Barry sustained swelling and bruising around his eyes, bruising and redness
22  to his left ear, and bruising to his neck near the shoulder.  (UMF No. 35.)  Neither Barry nor Gray
23  suffered serious bodily injury.  (UMF2 No. 85.)

24  Plaintiff's expert testified at deposition that fists, knees and elbows can be used as
25  a weapon, and fists can inflict great bodily injury.  (Griffin Depo. 48:6–20, Ex. I, ECF No. 57–2.)
26  Gray testified that the decedent used his hands as weapons.  (Gray Depo. 91:18–20.)

27  Barry testified to receiving the following training: he was trained to give a warning
28  before using deadly force when feasible; he was trained to deal with people with mental illnesses;

5

and he was trained that deadly force should only be used in an immediate defense-of-life situation. (UMF2 Nos. 77, 89, 92.)

## II.   LEGAL STANDARD ON SUMMARY JUDGMENT

A court must grant a motion for summary judgment "if . . . there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A motion for summary judgment calls for a "threshold inquiry" into whether a trial is necessary at all, that is, whether "any genuine factual issues . . . properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). The court does not weigh evidence or pass on the credibility of witnesses; rather, it determines which facts the parties do not dispute, then draws all inferences and views all evidence in the light most favorable to the nonmoving party. *See Id.* at 255; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

The moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of the [record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the non-moving party to "go beyond the pleadings" and "designate specific facts" in the record to show a trial is necessary to resolve genuine disputes of material fact. *Id.* The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 247–48.

## III.   DISCUSSION

Defendants first argue plaintiff lacks standing to bring a survival claim under § 1983 or state law. In the alternative, defendants argue plaintiff's excessive force claims fail because the use of force was objectively reasonable. Defendants next argue plaintiff's second

6

1  claim for loss of familial relationship must be dismissed because Barry had a legitimate
2  governmental interest in using deadly force.  Defendants also argue Barry is entitled to qualified
3  immunity from plaintiff's § 1983 claims.  Finally, if the court grants summary adjudication of
4  plaintiff's § 1983 claims in defendants' favor, defendants argue the court should decline to
5  exercise supplemental jurisdiction over the remaining state law claims.
6  　　　　　　The court addresses each argument in turn.
7  　　　　　A.　　Survival Claims in Plaintiff's First and Third Claims:  Standing
8  　　　　　　　　1.　　Standing Generally
9  　　　　　　"As a prerequisite for filing suit for 'money or damages' against a public entity,
10  the California Government Claims Act requires presentation of a claim to the public entity." *Gen.*
11  *Sec. Servs. Corp. v. Cnty. of Fresno*, 815 F. Supp. 2d 1123, 1131 (E.D. Cal. 2011); *see* Cal. Gov't
12  Code §§ 911.2, 945.4; *see also State of California v. Superior Court* ("*Bodde*"), 32 Cal. 4th 1234,
13  1240–44 (2004).  The prefiling requirement covers claims sounding in tort, such as battery.  *See*
14  *City of Stockton v. Superior Court*, 42 Cal. 4th 730, 738 (2007).  Claims involving death or
15  injuries to a person or personal property must be presented no later than six months after the
16  accrual of the claim.  *See* Cal. Gov't Code § 911.2(a).  The date of accrual is that which would
17  pertain under the statute of limitations if the dispute were between private litigants.  *See Shirk v.*
18  *Vista Unified Sch. Dist.*, 42 Cal. 4th 201, 208–09 (2007).  The Government Claims statutes "must
19  be satisfied even in the face of the public entity's actual knowledge of the circumstances
20  surrounding the claim." *City of Stockton*, 42 Cal. 4th at 738.  The failure to timely present a claim
21  for money or damages to a public entity bars a plaintiff from bringing suit against that entity.
22  *Bodde*, 32 Cal. 4th at 1240.
23  　　　　　　A notice of claim to a public entity must meet the requirements of Government
24  Code section 910.  *See* Cal. Gov't Code §§ 910, 945.4.  Section 910 requires a claimant to state
25  the "date, place, and other circumstances of the occurrence or transaction which gave rise to the
26  claim asserted" and to provide a "general description of the . . . injury, damage or loss incurred so
27  far as it may be known at the time of presentation."  Cal. Gov't Code § 910.  A submitted claim
28  does not require the same detail and specificity as a pleading.  *Stockett v. Ass'n of California*

7

*Water Agencies Joint Powers Ins. Auth.*, 34 Cal. 4th 441, 445 (2004). Where a submitted claim is deficient, but the claim substantially complies with all of the statutory requirements, the doctrine of "substantial compliance" in some cases may validate the deficient claim. *See Sparks v. Kern Cnty. Bd. of Supervisors*, 173 Cal. App. 4th 794, 800 (2009). However, the doctrine of substantial compliance applies only when there is a defect in form, not when no claim was filed. *Nguyen v. Los Angeles Cnty. Harbor/UCLA Med. Ctr.*, 8 Cal. App. 4th 729, 734 (1992); *Nelson v. County of Los Angeles*, 113 Cal. App. 4th 787, 797 (2003).

Where two or more persons suffer separate and distinct injuries from the same act or omission, each person must submit a claim, and one cannot rely on a claim presented by another. *Nguyen*, 8 Cal. App. 4th at 732–34; *Pacific Tel. & Tel. Co. v. County of Riverside*, 106 Cal. App. 3d 183, 190–92 (1980). For example, in *Nelson, supra*, the decedent's mother filed a tort claim asserting survival claims for negligence, assault, and battery and describing her damages as "the loss of a son." *Nelson*, 113 Cal. App. 4th at 797. She did not mention any damages incurred by her son before or in connection with his death, and no separate claim was filed on behalf of her son's estate. *Id.* The court found the government claim was filed in her individual capacity only; because no claim was filed on behalf of the decedent's estate, she could not pursue a survival action against the county. *Id.*

Here, defendants argue plaintiff lacks standing to bring a survival claim under 42 U.S.C. § 1983 or state law because, like the plaintiff in *Nelson*, she filed no Government Code claim on behalf of the decedent's estate. (ECF No. 50-1, 6.) Plaintiff counters a Government Code claim is not required to file a federal civil rights lawsuit under 42 U.S.C. § 1983. (ECF No. 56, 9.) Further, she argues her claim was timely filed, the claim was rejected, and plaintiff then timely filed her complaint. (*Id.*)

        2.     <u>First Claim: Excessive Force under § 1983</u>

California Government Code section 911.2 does not apply to § 1983 and other federal claims. *Bodde*, 32 Cal. 4th at 1240 (quoting *Williams v. Horvath*, 16 Cal. 3d 834, 842 (1976)); *see also Donovan v. Reinbold*, 433 F.2d 738, 741–42 (9th Cir. 1970); *Garcia v. Adams*, No. 04-5999, 2006 WL 403838, at *10 (E.D. Cal. Feb. 17, 2006) (finding dismissal of state law

claims was appropriate where plaintiff did not comply with the Tort Claims Act, but § 1983 survival claims were proper if plaintiff showed she had standing under the California Code of Civil Procedure). The Government Code claim requirement does not apply to plaintiff's first claim.

Defendant notes Fourth Amendment rights are personal and in general may not be vicariously asserted. (Mot. 6 (citing *Alderman v. United States*, 394 U.S. 165, 174 (1969).) In § 1983 actions, however, "survivors of an individual killed as a result of an officer's excessive force may assert a Fourth Amendment claim on that individual's behalf if the relevant state's law authorizes a survival action." *Moreland v. City of Las Vegas*, 159 F.3d 365, 369 (9th Cir. 1998); *see also Basler v. City of Susanville*, No. 06-1813, 2007 WL 2710845, at *3 (E.D. Cal. Sept. 14, 2007).

Here, plaintiff has properly identified the relevant California law, which states a survival action "may be commenced by [1] the decedent's personal representative, or, if none, by [2] the decedent's successor in interest." Cal. Code Civ. Proc. § 377.30. To commence an action as a successor in interest, a plaintiff must file a declaration establishing compliance with Civil Procedure Code section 377.32.[4] Plaintiff has filed a declaration in compliance with each requirement of section 377.32. (*See* ECF No. 20.)

---

[4] Section 377.32 provides, in pertinent part, as follows:

(a) The person who seeks to commence an action or proceeding or to continue a pending action or proceeding as the decedent's successor in interest under this article, shall execute and file an affidavit or a declaration under penalty of perjury under the laws of this state stating all of the following:

    (1) The decedent's name.

    (2) The date and place of the decedent's death.

    (3) "No proceeding is now pending in California for administration of the decedent's estate."

    . . . .

    (5) Either of the following, as appropriate, with facts in support thereof:

The court DENIES summary judgment on plaintiff's survival claim of excessive force.

### 3. Third Claim: Battery

Plaintiff seeks both survival and wrongful death damages in her third claim for battery. (*See* Compl. ¶ 47.) Plaintiff's Government Claim shows her as the only claimant. (*See* ECF No. 20.) Her claim for damages identifies no damages recoverable by the estate, such as those incurred by the decedent before or at time of death. (*Id.*) The claim indicates only that plaintiff seeks damages in excess of $3,000.00. (*Id.*) Nothing indicates she is submitting a Government Code claim on behalf of the decedent's estate. Plaintiff argues no claim was submitted on behalf of the decedent's estate because the decedent died without any assets and no estate was ever opened. She further argues that because she is the successor in interest and there is no personal representative of the estate, her survival action for battery is proper. (ECF No. 52 at 10.) However, without a claim on behalf of the estate, plaintiff cannot pursue a survival action. *See Nelson*, 113 Cal. App. 4th at 797.

> (A) "The affiant or declarant is the decedent's successor in interest (as defined in Section 377.11 of the California Code of Civil Procedure) and succeeds to the decedent's interest in the action or proceeding."
>
> (B) "The affiant or declarant is authorized to act on behalf of the decedent's successor in interest (as defined in Section 377.11 of the California Code of Civil Procedure) with respect to the decedent's interest in the action or proceeding."
>
> (6) "No other person has a superior right to commence the action or proceeding or to be substituted for the decedent in the pending action or proceeding."
>
> (7) "The affiant or declarant affirms or declares under penalty of perjury under the laws of the State of California that the foregoing is true and correct."
>
> . . . .
>
> (c) A certified copy of the decedent's death certificate shall be attached to the affidavit or declaration.

1        Consequently, the court GRANTS summary judgment in favor of defendants on
2 plaintiff's survival claim for battery.

3        B.        Plaintiff's First Claim for Excessive Force:  Merits Discussion of Individual Claim
4                  1.        Standard

5        A claim of excessive force in violation of the Fourth Amendment is analyzed
6 under an objective reasonableness standard.  *Scott v. Harris*, 550 U.S. 372, 381 (2007).  To
7 determine if a Fourth Amendment violation has occurred, the extent of the intrusion on the
8 individual's Fourth Amendment rights must be balanced against the government's interests to
9 determine whether the officer's conduct was objectively reasonable based on the totality of the
10 circumstances.  *Miller v. Clark County*, 340 F.3d 959, 964, 968 (9th Cir. 2003).

11       The analysis involves three steps.  First, the severity of the intrusion on the
12 individual's Fourth Amendment rights is assessed by evaluating the type and amount of force
13 inflicted.  *Id.* at 964.  Second, the government's interests are evaluated by assessing (a) the
14 severity of the crime; (b) whether the suspect posed an immediate threat to the officer's or
15 public's safety; and (c) whether the suspect was resisting arrest or attempting to escape.  *Id.*  The
16 second, of these factors, whether a suspect poses an immediate threat to the safety of the officers
17 or others, i.e., the immediacy of the threat posed by a suspect, is the most important factor in
18 evaluating excessive force.  *See Gonzalez v. City of Anaheim*, 747 F.3d 789, 793 (9th Cir. 2014).
19 Third, the gravity of the intrusion on the suspect is balanced against the government's need for
20 that intrusion.  *Id.*  Ultimately, "[t]he calculus of reasonableness must embody allowance for the
21 fact that police officers are often forced to make split-second judgments—in circumstances that
22 are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a
23 particular situation."  *Graham v. Connor*, 490 U.S. 386, 396–97 (1989).

24       The court must assess reasonableness "from the perspective of a reasonable officer
25 on the scene."  *Graham*, 490 U.S. at 396.  Nevertheless, "because police misconduct cases almost
26 always turn on a jury's credibility determinations," summary judgment in excessive force cases
27 should be granted sparingly.  *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052
28 (9th Cir. 2003); *see also Glenn v. Washington County*, 673 F.3d 864, 871 (9th Cir. 2011).  "This

11

principle applies with particular force where the only witness other than the officers was killed during the encounter." *Gonzalez*, 747 F.3d at 795.

Drawing all reasonable inferences in favor of plaintiff, as explained below, the court finds triable issues of fact preclude summary judgment on the objective reasonableness of Barry's use of force both with respect to the initial Taser discharge and the use of deadly force.

2. Taser

a) Severity of Intrusion

The first intrusion at issue is Barry's use of a Taser in drive-stun mode. The Ninth Circuit previously has found the use of a taser in dart-mode to be an intermediate, significant level of force. *See Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010). In dart-mode, the Taser propels aluminum darts tipped with stainless steel barbs toward the target; the darts deliver an electric shock that instantly overrides the target's central nervous system upon contact. *See Mattos v. Agarano*, 661 F.3d 433, 443 (9th Cir. 2011) (quoting *Bryan*, 630 F.3d at 824). In drive-stun mode, the darts are removed from the Taser and the electric shock does not override the target's central nervous system. *Id.* In *Mattos*, the Ninth Circuit found the record before it was insufficient to determine what level of force is used when a Taser is deployed in drive-stun mode, but found it was not necessary to decide the issue to assess the reasonableness of the tasing in that case. *Id.* This court follows the Ninth Circuit's guidance in *Mattos* in not deciding the level of force used by a Taser in a drive-stun mode and rather, proceeds to determine whether the use of the Taser in this case was reasonable in light of the other factors. *Id.*

b) Government Interests at Stake

Both parties agree the officers were not arresting the decedent, but rather detaining him under Welfare and Institutions Code section 5150. While "there is an important governmental interest in getting an individual medical attention who appears to be a risk to himself due to a mental disorder," the interest differs in degree from the use of force justified against a person who has committed a crime. *Bryan*, 630 F.3d at 829 (finding use of Taser in dart mode against mentally ill individual who had committed nonviolent misdemeanors was excessive). Still, defendants had some justifiable interest in detaining the decedent.

12

Defendants argue the decedent posed an immediate threat because he "suddenly reached for something across Barry," the deputies suspected he was on methamphetamine, and the deputies learned he had recently expressed homicidal thoughts. (*See* Defs.' Mot. at 10.) However, the record suggests the decedent heard voices saying someone was going to kill plaintiff, not that he made statements "urging others to kill plaintiff" as defendants contend; at least there is a dispute as to what he said. A reasonable juror could conclude decedent's statements did not indicate he was an immediate threat to others. There were no weapons in the room, and the decedent was unarmed for the duration of the event. He spoke to the officers without incident for at least seven minutes and was initially compliant with their instructions. Under these circumstances, his "reaching for something" does not as a matter of law create a significant threat. The decedent's large size and the possibility he was on methamphetamine at most qualifies as a potential threat.

The decedent did actively resist detention by stiffening his arms. However, plaintiff's attempts to resist arrest were minimal and there is no evidence of an attempt to evade arrest by flight. Further, there is a genuine dispute regarding whether Barry warned he would use the Taser. *See Bryan*, 630 F.3d at 831 (noting the lack of a warning favored a finding of excessive force).

Plaintiff also argues it was unreasonable for Barry to tase the decedent because he was trained that tasing a mentally ill person can cause the situation to escalate. (*See* Opp'n at 16.) Even if an officer makes tactical decisions that are imprudent, inappropriate, or reckless, that does not render the decisions unreasonable. *See Billington v. Smith*, 292 F.3d 1177, 1189 (9th Cir. 2002). Plaintiff does not allege Barry's training permitted the use of a Taser on a mentally ill person under no circumstances. Accordingly, Barry's training on this matter does not weigh in the court's decision.

    c)  Totality of the Circumstances

Defendants argue the case is factually similar to *Neal-Lomax v. Las Vegas Metropolitan Police Department*, 574 F. Supp. 2d 1170, 1185 (D. Nev. 2008). There, the court found the use of a Taser seven times in drive-stun mode against a man on narcotics and in need of

13

medical care was not excessive. *Id.* The severity of the crime was low; as in the present case, the officers were trying to subdue the man so he could get medical care, not arrest him. *Id.* Despite repeated warnings that the Taser would be used, the man continued to resist arrest, including by grabbing one of the security officers and kicking even after he was handcuffed. Consequently, the court found the use of force was objectively reasonable. *See also Ciampi v. City of Palo Alto*, 790 F. Supp. 2d 1077, 1104 (N.D. Cal. 2011) (holding use of Taser in drive-stun mode to subdue plaintiff was objectively reasonable where plaintiff created potentially dangerous situation and actively resisted arrest by punching, hitting, and kicking officers).

Here, however, the decedent had not physically threatened the officers before he was tased, and there is a genuine dispute as to whether decedent was given a warning. Viewing the facts in the light most favorable to plaintiff, there exists a genuine issue as to the reasonableness of Barry's use of the Taser. *See Williams v. City of Merced*, No. 10-01999, 2013 WL 498854, at *11–13 (E.D. Cal. Feb. 7, 2013) (holding reasonable jury could find officer's use of Taser in drive-stun mode was excessive where officers were responding to domestic violence report, a crime of moderate severity; plaintiff minimally resisted arrest by failing to comply with officer instructions despite warnings; and plaintiff was unarmed and posed little threat to the officers).

### 3. Deadly Force

#### a) Severity of Intrusion

It is undisputed that Barry used deadly force against the decedent by shooting him with his gun. "An officer's use of *deadly* force is reasonable only if 'the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others.'" *Scott v. Henrich*, 39 F.3d 912, 914 (9th Cir. 1994) (emphasis in original) (quoting *Tennessee v. Garner*, 471 U.S. 1, 3 (1985)).

#### b) Government Interests at Stake

Because the decedent began attacking the deputies after being tased, defendants argue he violated the following California felony and misdemeanor statutes: California Penal Code sections 243 (assault on a peace officer), 245(a)(4) (assault with force likely to cause great

14

bodily injury), 69 (resisting a peace officer with violence), 242 (battery) and 148 (resisting a peace officer). (Defs.' Mot. at 12.)  However, the severity of these offenses, if committed, is partly mitigated because, as the Ninth Circuit cautions, "[e]ven when an emotionally disturbed individual is 'acting out' and inviting officers to use deadly force to subdue him, the governmental interest in using such force is diminished by the fact that the officers are confronted, not with a person who has committed a serious crime against others, but with a mentally ill individual." *Deorle v. Rutherford*, 272 F.3d 1272, 1283 (9th Cir. 2001); *see also Luchtel v. Hagemann*, 623 F.3d 975, 980 (9th Cir. 2010).  Thus, the severity of the decedent's crime given the facts here must be considered relatively low. Cf. *Robbins v. City of Hanford*, No. 04-6672, 2006 WL 1716220, *14 (E.D. Cal. June 19, 2006) (finding officer who fatally shot decedent while attempting to effectuate section 5150 detention acted reasonably where decedent was mentally ill and physically aggressive, undisputedly had history of violence, had assaulted family member, was wielding knife, and had backed officer into corner, placing him in fear of his life).

        After he was tased, the decedent arguably reacted violently.  He actively resisted detainment by pushing the officers and throwing punches.  The decedent's attack on the officers posed a threat of injury.  However, the nature of the attack and the level of threat are otherwise in dispute.  While fists can be used as a weapon, the decedent was otherwise unarmed and outnumbered.  Defendants argue the decedent could have grabbed Barry's gun despite the locking mechanism on the holster, but no evidence suggests the decedent reached for any weapon during the altercation.  Although Barry testified he was in danger of passing out and his medical records indicate he sustained a head injury, the record also shows Barry sustained only minor injuries.  Plaintiff's evidence does not entirely undermine Barry's account of the facts, but it does create a question as to the severity of threat the decedent posed.  A reasonable jury could conclude Barry was not in serious danger when he shot the decedent.

        Plaintiff also disputes whether Barry gave a warning before shooting the decedent.  However, both parties agree Barry shouted "Shoot him!" shortly before firing his gun, which could effectively function as a warning.  Plaintiff argues Barry had several less intrusive

15

alternatives to shooting the decedent, including additional Taser applications or waiting for additional units to arrive. (Opp'n at 13.) While an officer need not use the least intrusive means available, *see Billington*, 292 F.3d at 1190, the court must take these alternatives into consideration. *See Bryan*, 630 F.3d at 831 ("[That defendant] did not provide a warning before deploying the [Taser] and apparently did not consider less intrusive means of effecting [plaintiff's] arrest factor significantly into our *Graham* analysis.").

         c)      Totality of the Circumstances

As stated above, excessive force cases should be withheld from a jury in rare circumstances. In deadly force cases where the intrusion on the victim's Fourth Amendment rights is especially severe, the moving party has a heavy burden in showing a substantial government interest proportionate to the extensive force used. Defendants have not met that burden here. Consistent with the precedent applicable to cases involving mentally ill persons, the decedent was not being arrested for committing a crime, but being detained so that he could be provided medical attention. Taking the facts in the light most favorable to the plaintiff, the threat the decedent posed is subject to a genuine dispute. Summary judgment on the issue of excessive force is improper on this claim and so is DENIED.

    C.      Plaintiff's Second Claim: Loss of Familial Relationship (§ 1983)

Plaintiff's second § 1983 claim alleges plaintiff was deprived of her constitutional right of familial relationship as a result of Barry's excessive and deadly force in violation of the Fourteenth Amendment. (Compl. ¶¶ 33–37.)

"The liberty interest in familial companionship encompasses the familial relationship between spouses . . . and parents and children, including adult children." *Barba v. City of Shafter*, No. 12-00195, 2015 WL 848495, at *11 (E.D. Cal. Feb. 26, 2015) (collecting cases). To prevail on a loss of familial relationship claim, a plaintiff must show the defendant's conduct shocks the conscience. *See Provencio v. Vazquez*, 258 F.R.D. 626, 640 (E.D. Cal. 2009). To determine what behavior shocks the conscience, the "critical consideration [is] whether the circumstances are such that 'actual deliberation is practical.'" *Moreland*, 159 F.3d at 372 (quoting *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 851 (1998)). When circumstances allow

1  time to make unhurried judgments, an officer's "deliberate indifference" shocks the conscience.
2  *See Lewis*, 523 U.S. at 853.  When "unforeseen circumstances demand an officer's instant
3  judgment," such as in prison riots and high speed pursuits, the standard of liability becomes
4  "purpose to cause harm."  *Id.*  "[T]he heightened purpose-to-harm standard applies where a
5  suspect's evasive actions force the officers to act quickly."  *Wilkinson v. Torres*, 610 F.3d 546,
6  554 (9th Cir. 2010); *see also Porter v. Osborn*, 546 F.3d 1139 (9th Cir. 2008) (noting precedent
7  "require[s] that when an officer encounters fast paced circumstances presenting competing public
8  safety obligations, the purpose to harm standard must apply").  Here, the decedent's physical
9  aggression after being tased forced Barry into a fast-paced, evolving situation with insufficient
10 time for deliberation.  Accordingly, the purpose to harm standard applies.

11         An officer shows purpose to cause harm if, rather than making a purely reactive
12 decision, he acts to "induce . . . lawlessness, or to terrorize, cause harm, or kill."  *Lewis*, 532 U.S.
13 at 855; *see also Wilkerson*, 610 F.3d at 554 (noting "purpose to harm might be found where the
14 officer acted to bully a suspect or to 'get even'").  As with analyzing excessive force under the
15 Fourth Amendment, the court must consider the totality of the facts in order to determine whether
16 a Fourteenth Amendment violation has occurred.

17         In addition, "[w]here a claim for interference with familial relationships is
18 integrally predicated upon, or entwined with, other conduct that is alleged to be unconstitutional,
19 a finding that the other conduct was constitutional generally will preclude recovery for
20 interference with familial relationship."  *Schwartz v. Lassen Cnty. ex rel. Lassen Cnty. Jail*, No.
21 10-03048, 2013 WL 5375588, at *6 (E.D. Cal. Sept. 24, 2013) (quoting *Robbins v. City of*
22 *Hanford*, No. 04-6672, 2006 WL 1716220, *14 (E.D. Cal. June 19, 2006) (citing *Gausvik v.*
23 *Perez*, 392 F.3d 1006, 1008 (9th Cir. 2004)).

24         As explained above, the court has determined issues of fact preclude summary
25 judgment on plaintiff's Fourth Amendment claim with respect to the shooting of the decedent.
26 Plaintiff argues disputes of material fact also preclude summary judgment on her Fourteenth
27 Amendment claim.  (Opp'n at 21–22.)  Here, however, although the level of threat posed by the
28 decedent is in dispute, the record establishes that the decedent did physically attack the deputies

17

after being tased.  The decedent's physical attack is enough to establish as a matter of law that Barry was making a reactive decision.  Only two minutes passed from the use of the Taser to the use of deadly force.  Barry was forced to make a snap judgment in an escalating situation.  Plaintiff raises no facts suggesting Barry shot the decedent with a purpose to harm unrelated to a legitimate law enforcement objective.  Plaintiff has not established a substantive due process claim.

The court GRANTS summary judgment in favor of defendants on plaintiff's Fourteenth Amendment claim.

### D. Qualified Immunity From Plaintiff's § 1983 Claims (Barry)

"Qualified immunity shields public officials from civil damages for performance of discretionary functions.  It is 'an immunity from suit rather than a mere defense to liability . . . .'" *Mueller v. Auker*, 576 F.3d 979, 992 (9th Cir. 2009) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)).  Law enforcement officers are shielded from suit unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  The qualified immunity test is twofold.  Under the first prong, the court considers whether the alleged facts, taken in the light most favorable to plaintiff, show that defendants' conduct violated a constitutional right. *Tolan v. Cotton*, ___ U.S. ___, 134 S. Ct. 1861, 1865 (2014) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).  Under the second prong, the court determines whether that constitutional right was "clearly established." *Id.* at 1866.  Courts have discretion to address the prongs in any order in light of the circumstances of each case. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).  Additionally, in the excessive force context, an officer is entitled to immunity if he has a "mistaken understanding as to whether a particular amount of force is legal" in the particular circumstances confronting her. *Id.* at 205.

#### 1. Taser

As explained above, the underlying facts that would otherwise allow the court to determine whether Barry's use of the Taser was reasonable are disputed.  Hence, the court cannot define the specific context of this case without impermissibly treating the genuinely disputed facts

18

as undisputed. And that the court cannot do. Because there is a genuine dispute of material fact as to whether tasing was reasonable, the court cannot determine whether, as a matter of law, the federal right at issue was clearly established. As such, the court cannot at this time find Barry eligible for qualified immunity on this claim. *See Johnson v. Jones*, 515 U.S. 304, 313 (1995).

### 2. Shooting

Defendants correctly argue that no clearly established law prohibits an officer from using deadly force when he is losing in hand-to-hand combat. *See Billington*, 292 F.3d at 1185. At the same time, it is clearly established that an officer may not use deadly force in the absence of an objective and immediate threat. *See Wilkinson*, 610 F.3d at 550. As explained above, factual disputes prevent the court from determining whether Barry was in serious, imminent danger at the time he shot the decedent. Having concluded factual disputes preclude summary judgment on Barry's use of deadly force, the court cannot at this time find Barry entitled to qualified immunity on this claim. *See Johnson*, 515 U.S. at 313.

### 3. Loss of Familial Relationship

Defendants argue Barry is entitled to qualified immunity because established law permits an officer to make a snap judgment in a rapidly escalating situation to further a legitimate governmental interest. (*See* Mot. at 17 (citing *Wilkerson*, 610 F.3d at 554; *Porter*, 546 F.3d at 1137).) In response, plaintiff has raised no arguments opposing granting qualified immunity on the Fourteenth Amendment claim.

The purpose-to-harm standard of culpability was clearly established before the events at issue took place. *See Porter*, 546 F.3d at 1140. Whether Barry is entitled to qualified immunity thus turns on whether he acted with an unconstitutional purpose to harm the decedent. Because the court has concluded above that Barry shot the decedent in reaction to his physical attack, the court finds he acted without purpose to harm and violated no clearly established law. Barry also is entitled to qualified immunity in the face of plaintiff's Fourteenth Amendment claim.

E. <u>Supplemental Jurisdiction over Remaining State Law Claims</u>

Because the court has denied defendants' motion for summary judgment on plaintiff's § 1983 claim regarding the use of deadly force, the court will continue to exercise supplemental jurisdiction over the remaining state law claims.

IV. <u>CONCLUSION</u>

For the foregoing reasons, the court orders as follows:

1. Defendants' Motion for Summary Judgment is GRANTED as to plaintiff's survival claim in claim 3, for battery against Barry and vicariously against the County.

2. Defendants' Motion for Summary Judgment is GRANTED as to plaintiff's Fourteenth Amendment familial relationship claim (claim 2).

3. Defendants' Motion for Summary Judgment is otherwise DENIED.

4. Defendants' Request to Strike Plaintiff's Supplemental Brief is GRANTED.

5. This order resolves ECF Nos. 50, 62.

6. The court sets a Final Pretrial Conference on **November 12, 2015 at 3:30 p.m.**, at which a trial date will be confirmed. The parties shall file a joint pretrial statement in advance of the conference, as required by the court's scheduling order.

IT IS SO ORDERED.

DATED: September 17, 2015.

_____
UNITED STATES DISTRICT JUDGE